IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **TIM MEEKER**, on behalf of himself and a Class of all individuals similarly situated, | ) ) ) ) | |
| v. | ) ) | Cause No. 09-607-DRH |
| **APPLE, INC.** | ) ) | |
| Serve: CT Corporation System 818 West Seventh Street Los Angeles, CA 90017 | ) ) ) ) | |
| and | ) ) | |
| **AT&T MOBILITY, L.L.C.,** | ) ) | |
| Serve: CSC Lawyers Incorporating Service Company 221 Bolivar Street Jefferson City, MO 65101 | ) ) ) ) ) | |
| Defendants. | ) | |

## COMPLAINT

COMES NOW Tim Meeker ("Meeker"), by and through counsel, on behalf of himself and a Class of individuals similarly situated, and files this Class Action Complaint against Defendants Apple, Inc. and AT&T Mobility, L.L.C. (collectively "Defendants"), to-wit:

## PARTIES. JURISDICTION AND VENUE

1. Plaintiff Tim Meeker is a resident of St. Clair County, Illinois and a citizen of Illinois.

2. Defendant Apple, Inc. ("Apple") is a California corporation with its principal place of business in Cupertino, California. Apple is a citizen of California.

1

3.  Defendant AT&T Mobility, L.L.C. ("AT&T") is a Delaware limited liability corporation with its principal place of business in Atlanta, Georgia.  AT&T is a citizen of Georgia and Delaware.

4.  Apple is one of the largest computer manufacturers in the world.

5.  AT&T is one of the largest mobile phone companies in the world.

6.  Both are Fortune 500 companies, with annual sales in the billions of dollars.

7.  Both Apple and AT&T do business in the Southern District of Illinois.

8.  Both Apple and AT&T perform systematic and continuous business in Illinois.

9.  Defendants' deception and fraud in connection with the sale of 3G iPhones occurred in Illinois.

10.  Under Illinois' long-arm statute, both AT&T and Apple have sufficient minimum contacts to establish *in personam* jurisdiction over them in the Courts of Illinois.  Under the Due Process Clause of the Constitution, AT&T and Apple have sufficient minimum contacts to establish *in personam* jurisdiction over them in Illinois.

11.  This lawsuit relates to the Defendants' employment of deception and concealment in connection with the sale and advertisement of merchandise to Plaintiff, relating to the sale of 3G and 3G-S iPhones purchased from Apple Stores and AT&T Stores.  This lawsuit is based upon violations of the Illinois Deceptive Trade Practices Act, *815 ILCS 505/1 et seq.*

12.  This cause of action accrued in the Southern District of Illinois.

13.  Pursuant to the Class Action Fairness Act, the district courts have original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000 exclusive of interests or costs and is a class action in which any

member of the class is a citizen of a State different from any defendant. 28 U.S.C. Sec.

1332(d)(2)A).

14. Here, Plaintiff is a member of the class and is a citizen of Illinois. The defendants

are citizens of California, Georgia, and Delaware. Therefore, the diversity requirement is

satisfied.

15. The amount in controversy in this matter, exclusive of interests and costs, is expected

to exceed $5,000,000.

16. The "primary defendants" from whom significant relief is sought and whose alleged

conduct forms the basis for the claims asserted by the class are AT&T Mobility, L.L.C.

and Apple, Inc. Neither is a citizen of Illinois.

17. No defendants are States, State officials, or other governmental entities.

18. Accordingly, jurisdiction in federal court is allowed under 28 U.S.C. Sec. 1332(d).

19. Venue in the Southern District of Illinois is appropriate under 28 U.S.C. Sec. 93(c).

### BACKGROUND FACTS

20. In January 2007, the iPhone was launched. The iPhone was manufactured and

created by Defendant Apple. The iPhone is a combination of an iPod (which stores

thousands of music files and plays them back for the listener) and a cellular phone (which

allows users to talk on the telephone while mobile) with an incredible amount of creative

functionality. The cell phone portion of the iPhone works exclusively with the AT&T

cellular phone network. Defendants Apple and AT&T launched the iPhone as a joint

venture. Both AT&T and Apple sold the iPhone in their respective stores.

21.  The original version of the iPhone was called the "2G."  The next generation,

launched in July 2008, was called the "3G."  The most recent version, launched in June

2009, is called the "3G-S."

22.  Since its creation, one flaw of the original 2G iPhone was that it did not allow

"Multimedia Messaging Service," or "MMS," which, among other things, allows users to

send a picture to another user's cell phone.

23.  Apple advertised heavily that the new version of iPhone, the 3G, as well as the even

newer version, the 3G-S, would allow MMS.  Apple's print and video advertisements in

on television, the Internet, the radio, newspapers, and direct mailers all touted the

availability of MMS.

24.  Similarly, AT&T advertised that the 3G and 3G-S would allow MMS.  MMS

functionality was one of the reasons people chose to buy or upgrade to a 3G or

3G-S.

25.  MMS has been available on other types of cell phones for many years.

26.  From Apple's website:

> ***Send MMS***
> *Take a photo or shoot some video, then send it via Messages.  You can also send*
> *audio recordings from within Messages, information from Contacts, and*
> *directions from Maps.*

27.  A Pop-Up window on Apple's website reads:

Sending Photos and Videos

You can take a photo or make a video (iPhone 3GS only) from within Messages and

include it in your conversation with another MMS-capable device.

28.  From AT&T's website:

<u>Messages</u>

Use messages to send text, photos, audio, video, and more.  Forward a whole message or just the important parts.

29.  After the 3G iPhone came out in July 2008, customers who purchased the 3G iPhone began to realize that MMS was not available.

30.  In response, AT&T published this in the AT&T Answer Center page of their website for problems related to MMS:

Customers who are sent a MMS message and own a non-MMS capable device will receive a text message instead of an actual MMS message.  The message will contain the website address of www.viewmymessage.com/1 or www.viewmymessage.com/2 as well as a user name and password.  To view the MMS message, please access the website from a computer and enter the user name and password provided in the text message.

31.  Incredibly, AT&T was directing customers interested in MMS to go to a computer to view the message.

32.  The AT&T Answer Center has this unhelpful solution for the problem "Send, Receive, or Delete a Picture, Audio, or Video Multi-Media Message (MMS) with iPhone":

*Goal:* Send, Receive, or Delete a Picture, Audio or Video Multi-media Message with iPhone

*Symptom:* Unable to Send, Receive, or Delete a Picture, Audio, or Video Multimedia Message with iPhone

*Fix:*  iPhone does  not support sending, or receiving picture, audio, or video multimedia messages.  If an MMS is sent to the iPhone, it will receive a text message instead that contains a link to a website address where the message can be viewed.

The "Fix" was essentially to say "tough luck."

5

33. In early 2009, sales representatives for both Apple and AT&T represented that MMS would be available on both the 3G and the 3G-S beginning on June 17, 2009, when the new iPhone OS 3.0 Software Update would become available.  Representatives in Apple and AT&T stores assured customers that with this new application, which could be downloaded for free, MMS would be available.

34. In the spring of 2009, AT&T began a huge sales drive to sell its older 3G models in preparation for the launch of 3G-S.  AT&T lowered the price of a 3G to less than $100 and assured customers that the new 3.0 Software Upgrade would solve all their problems.

35. Apple posted on its website, on the "iPhone OS 3.0 Software Update" page, that MMS would be available, so that customers could "send MMS messages and include photos, audio, and contact info.  Even tap to snap a picture right inside Messages."  A graphic showed the familiar iPhone test message bubbles with a picture inserted.

36. Millions of customers, as a result of the false and deceptive representations and concealments of Apple and AT&T purchased the 3G and 3G-S, waiting for the wonderful day in June 2009 when the new application would be available which would allow MMS.

37. Unfortunately, after downloading the new 3.0 Software Update application, MMS still did not work on both the 3G and 3G-S.

38. The Apple troubleshooting page explained the problem:

> To send and receive MMS messages on your iPhone 3G, do the following:
>
> 1. Verify that your iPhone and wireless carrier meet the system requirements.  To use MMS you need:

6

--iPhone OS 3.0 installed on iPhone 3G.  The original iPhone does not

support sending or receiving MMS messages.  Install iPhone OS 3.0 if

necessary.

--A wireless carrier that supports MMS.

--A coverage area in which you can place and receive a call, and access

the Internet using Safari on your iPhone (3G network coverage

recommended).

2.  If this article shows that your carrier supports MMS, you should see MMS

Messaging in the Settings>Messages>General screen as shown below.

39.  The "this article" phrase was a blue-colored hyperlink.  Clicking on that hyperlink

leads to a page showing several countries.  Clicking on North America, and viewing the

graph for USA, under the heading "AT&T" it shows that AT&T is NOT a carrier which

offers MMS.  Of course, AT&T is the ONLY carrier in the United States used by the

iPhone.

40.  In other words, AT&T's towers do not support MMS.  In an article in the St. Louis

Countian, AT&T spokesman Marty Richter admitted that AT&T does not support MMS

for the iPhone.

41.  Calling Apple Customer Support reveals that AT&T has never upgraded its towers

so as to support the functionality necessary for MMS.  Therefore, the iPhone cannot offer

MMS as claimed.

42.  The only excuse offered by AT&T and Apple is a mouseprint disclaimer on the

website, in barely readable font, which reads "MMS Support from AT&T coming in late

summer."

43.    None of the materials in either the Apple or AT&T stores advise consumers that the MMS functionality of the phones will only work after the AT&T towers are upgraded to support MMS in "late summer."

44. When and if AT&T upgrades its towers, the millions of iPhone purchasers will get what they should have in terms of MMS capability.  In the meantime, all the millions of purchasers of the 3G and the 3G-S iPhone have been deceived by the Defendants as to the phone, which in fact does not currently have MMS functionality.

45.  Apple and AT&T representatives continue to misrepresent and/or conceal, suppress, or omit material facts to customers in their stores about the MMS functionality of the 3G and 3G-S iPhones.

### NAMED PLAINTIFFS' FACTUAL ALLEGATIONS

46.  Meeker, a resident of Lebanon, Illinois, bought his iPhone on March 13, 2009 at the AT&T store located at 6403 North Illinois Street, Fairview Heights, Illinois 62208.  His phone number is 618-580-4337.

47.  Meeker was interested in a phone with MMS functionality.

48.  Plaintiff asked the store representative if the iPhone provided MMS.

49.  The store representative misrepresented and/or concealed, suppressed, or omitted facts as to the iPhone and MMS functionality.

50.  Meeker purchased the 3G iPhone.

51.  When the 3.0 Software Upgrade became available, Meeker downloaded it.

52.  Despite the download, MMS still did not work.

53.  Meeker called Apple Customer Service.  It was at this time that Meeker learned that

AT&T had not upgraded its towers and may not do so until sometime in the late summer

of 2009.

54.  Meeker never saw the microprint disclaimer about "AT&T Support for MMS coming

in late summer" on the Apple or AT&T websites.

55. Meeker has been damaged in that for many months he has been unable to send MMS

messages.

## CLASS ACTION ALLEGATIONS

56.  This action is brought by Plaintiff pursuant to the Illinois Deceptive Trade Practices

Act, *815 ILCS 505/1 et seq.* and common law breach of contract, on behalf of himself and

thousands of other iPhone 3G and 3G-S purchasers from Apple and AT&T who are

similarly situated to Plaintiff. The class is defined as follows:

### CLASS DEFINITION

**All residents of Illinois who, between July 2008 and the date of final judgment
or settlement, have purchased a 3G or 3G-S iPhone from either AT&T
Mobility L.L.C. or Apple, Inc. for personal, family, or household use.**

57.  The class is so numerous that joinder of all members is impractical.   Published news

reports stated that over a million customers purchased the 3G iPhone the day it became

available.  Many of those customers are located in Illinois.  It is estimated that the Class

will be composed of at least 100,000 individuals.

58.  Each Plaintiff will be claiming damages for the 3G or 3G-S iPhone he or she

purchased.  A 3G iPhone was selling from anywhere between $100 and $500.

59.  No attorney would have the financial resources to litigate this case against opposition from the Defendants when the potential for recovery is so small for each class member. Therefore, joinder of all similarly situated plaintiffs is appropriate.

60.  The claims asserted by Plaintiff on behalf of himself and all similarly situated Class members present questions of fact or law common to the class, including, *inter alia*, whether Defendants engaged in deceptions and concealments in making claims that MMS was available on the 3G and 3G-S in violation of the Illinois Deceptive Trade Practices Act, *815 ILCS Sec. 505/1 et seq.*

61.  The claims asserted by Plaintiff on behalf of himself are typical of the other Class members' claims in that the other Class members also received similar representations about MMS.

62.  Plaintiffs will fairly and adequately protect the interests of the members of the Class in that their claims are similar, the amount of damages are similar, and the relief requested is similar.

63.  The prosecution of separate actions by individual members of the Class would create the risk of: (a) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for Defendants; and (b) adjudications with respect to individual members of the Class which would as a practical matter be dispositive of the interests of other members not parties to the adjudications or substantially impair or impede their ability to protect their interests. Furthermore, Defendants have acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

64.  Plaintiff's counsel is experienced legal class counsel, and will adequately protect the interests of the Class members.

65.  To Plaintiff's knowledge, there currently are no other similar actions filed in Illinois against these Defendants making similar claims.

66.  Questions of law and fact common to the members of the class predominate over questions affecting individual members.  Those common questions of law and fact include:

**Fact Questions**

(a) did the Defendants know that AT&T had not upgraded its towers to support MMS, and, if so, when did they gain this knowledge;

(b) did the Defendants know that most customers viewed MMS as an important functionality;

(c) did the Defendants conceal from consumers that: (1) AT&T had not upgraded its towers to support MMS and had no plans to do so for many months; and (2) the 3.0 Software Upgrade would not fix the problem and make MMS available (by itself);

(d) was Defendant aware of alternative methods of disclosure which would have more adequately warned customers of the unavailability of MMS and the reason for the non-availability of MMS;

(e) did the Defendants market and advertise their 3G and 3G-S phones as supporting MMS with no mention, or little mention, of the fact that AT&T towers were not equipped to support MMS;

(f) do the salespersons at Apple and AT&T have any scripts or training materials which

would provide them with knowledge or information as to the fact that AT&T towers do

not support MMS, or any advice as to when the towers will support MMS;

(i)  according to Apple's and AT&T's marketing research, is MMS functionality an

important decision driver for residential consumers when buying iPhones;

(j) when will AT&T have finished its tower upgrade;

(l)  did any officials from AT&T or Apple believe that the advertisements to customers

relating to MMS were misleading to consumers;

(m) did AT&T or Apple receive complaints from consumers about the lack of MMS

functionality, and what was their response;

(o) what did Defendants tell their own managers and employees internally about MMS

functionality;

(p) were any committees or work groups created to solve the MMS problem, and what

was said in their meetings;

(q)  why don't Apple and AT&T tell customers the truth about MMS when the customer

is buying the product in the store; and

(s) other fact questions.


**Law Questions**

(a) did the Defendants engage in an unfair practice in connection with the sale or

advertisement of merchandise under the IDTPA when they represented to Illinois

consumers that their iPhones would have MMS functionality;

(b) did the Defendants employ any deception, fraud, false pretense, false promise, or misrepresentation, in connection with the sale or advertisement of merchandise under the IDTPA when they represented to Illinois consumers that their iPhone would have MMS functionality;

(c) did the Defendants employ any deception, fraud, false pretense, false promise, or misrepresentation, in connection with the sale or advertisement of merchandise under the IDTPA when they represented to Illinois consumers that the 3.0 Software Upgrade would allow their iPhones to have MMS functionality?

(d) did the Defendant conceal, suppress, or omit material facts when they failed to reveal to consumers that: (a) the towers of AT&T—the exclusive phone network for the iPhone-- did not support MMS functionality; (b) AT&T would not have the towers upgraded for many months; and (c) the 3.0 Software Upgrade would not, by itself, solve the problem;

(e) to what extent and in what amount were Plaintiffs and the Class damaged by Defendants' unlawful actions?

(f) Does the Defendants' conduct constitute such intentional and outrageous conduct so as to subject the Defendants to an award of punitive damages under the IDTPA?

(f) do the Defendants have affirmative defenses which are common to all class members? and

(g) other legal questions.

67.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

68. To Plaintiff's knowledge, no other individual has expressed an interest in bringing an individual action against Defendants in Illinois based upon these claims.

69. It is desirable to concentrate the litigation of these many claims in one forum.

70. There will be very few management difficulties likely to be encountered if this case is certified as a class action.

71. Accordingly, class certification is appropriate.

## COUNT I
### (Illinois Deceptive Trade Practices Act, 815 ILCS Sec. 505/1 et seq. )

72. Plaintiff reincorporates and realleges Paragraphs 1 through 71 as if more fully set forth herein.

73. *815 ILCS 505/2* provides as follows:

*Unfair competition and deceptive practices*

*Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965 [815 ILCS 510/2], in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5 (a) of the Federal Trade Commission Act [15 U.S.C. § 45].*

74. *815 ILCS Sec. 505/10a* provides as follows:

*Action for actual damages*

*(a) Any person who suffers actual damage as a result of a violation of this Act committed by any other person may bring an action against such person. The court, in its discretion may award actual economic damages or any other relief which the court deems proper….*

*(b) Such action may be commenced in the county in which the person against whom it is brought resides, has his principal place of business, or is doing business, or in the county where the transaction or any substantial portion thereof occurred.*

*(c) Except as provided in subsections (f), (g), and (h) of this Section, in any action brought by a person under this Section, the Court may grant injunctive relief where appropriate and may award, in addition to the relief provided in this Section, reasonable attorney's fees and costs to the prevailing party.*

*(d) Upon commencement of any action brought under this Section the plaintiff shall mail a copy of the complaint or other initial pleading to the Attorney General and, upon entry of any judgment or order in the action, shall mail a copy of such judgment or order to the Attorney General.*

\* \* \*

75.  *815 ILCS Sec. 510/2* provides as follows:

***Deceptive trade practices.***

*(a) A person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation, the person:*

\* \* \*

*(5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have….*

\* \* \*

*(7) represents that goods or services are of a particular standard, quality, or grade or that goods are a particular style or model, if they are of another;*

\* \* \*

*(9) advertises goods or services with intent not to sell them as advertised;*

\* \* \*

*(12) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding.*

*(b) In order to prevail in an action under this Act, a plaintiff need not prove competition between the parties or actual confusion or misunderstanding.*

*(c) This Section does not affect unfair trade practices otherwise actionable at common law or under other statutes of this State.*

76.  *815 ILCS Sec. 510/3* provides:

***Injunctive Relief***

*A person likely to be damaged by a deceptive trade practice of another may be granted injunctive relief upon terms that the court considers reasonable. Proof of monetary damage, loss of profits or intent to deceive is not required. Relief granted for the copying of an article shall be limited to the prevention of confusion or misunderstanding as to source.*

*Costs or attorneys' fees or both may be assessed against a defendant only if the court finds that he has willfully engaged in a deceptive trade practice.*

*The relief provided in this Section is in addition to remedies otherwise available against the same conduct under the common law or other statutes of this State.*

77.  Defendants concealed, suppressed, and omitted the following material facts in

connection with the sale and advertisement of 3G and 3G-S iPhones to consumers in

Illinois:

(a) AT&T had not upgraded its towers to support MMS, and therefore MMS

would be unavailable on iPhones until the towers were upgraded;

(b) AT&T would not have the towers upgraded for many months; and

(c) the 3.0 Software Upgrade would not, by itself, solve the problem and make

MMS available.

78.  Defendants employed, in connection with the sale and advertisement of 3G and 3G-S

iPhones, to Illinois consumers, deception, fraud, false pretense, false promise,

misrepresentation, and unfair practices, including but not limited to representing that the

phones would support MMS when Defendants knew, in fact, that they would not support

MMS.

79.  Defendants violated the Uniform Deceptive Trade Practices Act, specifically *815

ILCS Sec. 510/2(a)(5)* because Defendants represented that the 3G and 3G-S iPhones  had

characteristics, uses, and benefits that they do not have.

80.  Defendants violated the Uniform Deceptive Trade Practices Act, specifically *815

ILCS Sec. 510/2(a)(7)* in that Defendants falsely represented that the 3G and 3G-S

iPhones were  of a particular standard, quality, or grade when they were of another.

81.  Defendants violated the Uniform Deceptive Trade Practices Act, specifically *815

ILCS 510/2(a)(9)* in that Defendants falsely advertised the 3G and 3G-S iPhones with

intent not to sell them as advertised.

82.  Defendants violated the Deceptive Trade Practices Act, specifically *815 ILCS Sec.

510/2(a)(12)* in that Defendants engaged in conduct relating to the sale and advertisement

of the 3G and 3G-S iPhones which created a likelihood of confusion and

misunderstanding among Illinois customers.

83.  As a direct result of the deceptions, frauds, false pretenses, misrepresentations, unfair

practices, concealments, suppressions, and omissions of Defendants, and violations of the

Illinois Deceptive trade Practices Act and the Uniform Deceptive Trade Practices Act,

Plaintiffs have suffered an ascertainable loss of money, namely the difference in value

between the iPhone as represented and the iPhone as it actually exists.

84.  Moreover, Defendants' actions were intentional and outrageous, without any

justification or excuse, and warrant the imposition of punitive damages under the IDTPA.

85.  In the event Plaintiffs are the prevailing parties, Plaintiffs also seek reasonable attorney's fees and costs under the IDTPA.

## COUNT II

### (Breach of Contract)

86.  Plaintiff reincorporates Paragraphs 1 through 85 as if more fully set forth herein.

87.  Defendants and Plaintiff had a valid contract, supported by sufficient consideration, pursuant to which, for a fee, Defendants were to supply an iPhone as represented with MMS functionality.

88.  Defendants materially breached the contract by providing an iPhone without MMS functionality.

89.  As a direct result of Defendants' material breach of the contract, Plaintiff was damaged.

## RELIEF SOUGHT

90.  Plaintiff reincorporates and realleges Paragraphs 1 through 89 as if more fully set forth herein.

91.  Plaintiffs seek the following relief:

(a) an order, entered as soon as practicable, certifying this case as a class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) an order directing that appropriate notice to class members be delivered;

(c) compensatory damages for Plaintiff and the other Class Members in an amount which is fair and reasonable to compensate them for their damages;

(d) punitive damages in an amount which is fair and reasonable;

(e) reasonable attorney's fees and costs; and

(f)  such other relief as the Court deems just and proper.

**Respectfully Submitted,**

**ROSENBLUM, SCHWARTZ, ROGERS, GLASS, P.C.**

By:      _S/ Joel J Schwartz_____
         JOEL J SCHWARTZ, #18652
         jschwartz@rsrglaw.com
         120 S. Central, Suite 130
         St. Louis, MO 63105
         Phone: (314) 862-4332
         Fax:    (314) 862-8050